May it please the Court, I'd like to start my presentation today with just a brief review of the statute. At least I'd like to get the acronyms straight. The statute that I pronounce as ELIPA is the Emergency Low Income Housing Preservation Act of 1987. That's the two year moratorium, the temporary emergency moratorium. We've had a lot of these cases. I'm betting that we all know the acronyms well by now. Can I jump right to the heart of something that's concerning me? Would you mind if I do? What's that? I'd like to jump right to the heart of something. Don't you think that I understood your briefs as saying our decision in Sienega 8 that says the Sovereign Acts Doctrine does not apply with these exact statutes ought to control here. I mean, yes, that was made in the context of takings, but I didn't understand from the government any justification why Sienega 8 ought not to apply in this context. That's our whole argument. That's what I thought. I mean, I just want to make sure I wasn't missing out on something. I'm not even sure I preserved five minutes for rebuttal, but that's our entire argument in one sentence. Okay, well let me ask you one other thing because this is something that really concerns me. If I do agree with you on the breach of contract claim and say Sienega 8 doesn't insulate the government's acts, that's clear, no sovereign acts apply here, no insulation. So if I agree with you, then you would receive recovery under breach of contract, but you would no longer get recovery under takings because you can't double dip. You can't get it twice, right? We don't expect to double dip. Okay, I just want to make sure. So you're agreeing if we were to find in favor of you on the breach of contract, then you agree that we should not similarly reach out and do takings. Well, yes, I agree we should not double dip. Now, let me point out, though, Sienega 8, which is a most unusual case. It is really a comprehensive analysis of not only the takings claim there, but a large group of the takings claim. And the interesting part is, insofar as quantum is concerned, is that the court in Sienega 8 took the findings and the conclusions on quantum from Sienega 3, which was a decision on a breach of contract. It was not a takings decision, but you might say a quantum decision on a breach. And the court said, well, that's adequate for us to use in determining the just compensation under the takings. Let me put it this way. I guess if I can put the analogy properly, it is my old high school geometry formula, which is things equal to the same things are equal to each other. So maybe you're saying we don't need to remand because we already know what damages are in the takings context and it ought to apply the same. Yes, Your Honor. In fact, the basic, let's say the basic methodology for determining quantum is to put the victim back into the same position that he would have been in if there had been no event. I say no event, no contract breach or no taking, either one. And that's the same. The difference and the damage under the contract breach is again the same. It is, as the court in Sienega 8 said, the court calls it lost profits. Actually, I guess you call it foregone lost rental income. It is the difference between the rental income that we actually got by being held for six years, six additional years, under the HUD regime, the controlled rents, versus the rentals we couldn't have gotten had we been permitted to exit the program and turn the project into a market rental. In other words, we wouldn't have gotten market rentals. We would agree there would have to be a recognition of the additional expense in light of what occurred to put the property in shape to get the higher up. Yes, Your Honor. But that, I take it, would be spread over the remaining life of the property. Yes. I would think so, Your Honor. That would give you much less than what under the quantum part of the takings part of the trial court's decision would be much lower. That's the one thing I was wondering, if you're not giving something up when you told me that the damages under takings and the damages under a breach ought to equate, because it So don't you still want us to remand this, to have them reanalyze it? I assume, Your Honor, that in all probability, we should be remanded. I would like, however, the court to review some of the basic documents, one of which is the question of time in this We are now in our, let's see, we filed in 96. Sienega filed in 95. Is this about interest? I'm not talking about interest. I'm talking about how do you determine the present value of it. And we think that, A, we should get the present value of the damage, even though on past numbers. The trial judge, on the other hand, said, no, this goes from 91 to 97. We wanted present value determined as of 97. He said, no, we put it all back to 91. He didn't address this with regard to breach, because he found no breach, because he didn't have the benefit of our Sienega decision at the time. Very true. So why shouldn't we remand this and let him have a first shot at determining these factual matters about what the date ought to be? I know you think you know how he's going to come out on them and you don't like it, but he hasn't really ruled on those yet. Probably. Probably, Your Honor. At least he's ruled on it, or he's given his sentiments with respect to the taking. I think also, well, I think I should save the rest for rebuttal, because I think it's rather clear we had a contract. There is no privity case here. The government concedes privity. Our contract was breached, whereas in those other situations where they were not. Other cases, there's a taking. Now, one more thing I would like to point out to the court, an interesting thing. I keep asking myself the same question. Must we prove that we are more than just one project and one plaintiff making a breach claim? First, I agree, I don't think that we have to, but it's obvious the statute was intended to cover both breaches and taking, the two elements, the insured mortgage versus the mortgage held. I cited in our reply brief on page 6 in the footnote a study done by HUD. The study done by HUD is, if I might state, not a casual thing at all. It was part of a large effort done by most of the agencies of government on housing. It was done in 1973-74 timeframe, and HUD's conclusion was, with respect to the 2021 D3 program, that within the first 10 years, 30% of the projects would go through foreclosure. Maybe they would suffer the same kinds of problems we do. Of course, that's the first 10 years. How did the congressional actions take place just before the 20 years? How much for 20 years? The answer, extrapolated to 30%, I think it's an awful lot of problems. I don't know how many projects there are of these cases alike. I don't much care. Thank you, Your Honor. Thank you, Mr. Kramer. Mr. Dinser. Thank you, Your Honor. May it please the Court. The Court should conclude that the trial court properly rejected the plaintiff's contract in taking this claim. What I'd like to do, Your Honor, is go directly into Cienega Gardens. It does not address or resolve the Solomon Act question, and for two reasons. The first is, by the terms of Cienega A, it does not resolve anything beyond the four corners of that decision. Coming into that decision, there was a breach of contract record. The government made, as the Court— Counsel, in your brief, you're telling me that Cienega Gardens is irrelevant to our decision-making. Irrelevant! I mean, come on, you know what the standard of relevance is, right? Absolutely, Your Honor. You want to stand by that? Irrelevant to our decision-making? They look at these exact statutes and make specific and concrete findings about the statutes. Your Honor, to the extent that it is relevant at all, it benefits the government's position. I'll be happy to explain, Your Honor. The Sovereign Act Doctrine asks the question whether a statute was targeted at a specific contracting partner or whether it's a more general statute. And does Cienega Gardens say anything about that? What Cienega Gardens is, is it's a case by people who were affected by that statute who did not have a contract with the government. They are living proof that the statute that the plaintiffs complained about was not targeted at them because— Counsel, it didn't address the breach of contract because those people weren't in privity with the government, but what it really addressed was the Sovereign Act's defense, which applies equally. I've seen no cases that suggest the Sovereign Act's defense ought to apply differently in a breach of contract case than it ought to apply in a takings case. Your Honor, the Sovereign Act's defense is one that says that a statute—the Sovereign Act's defense is the defense for a breach of contract harm. And under the Sovereign Act defense, basically what happens is the government says—the court says the government's contractor is different than the government as legislature and sovereign. And so we will not hold the government's contractor responsible for the actions of the government as legislator. The defense against that—and because of that, the government is able to assert impossibility. Whether or not CNA's guidance is binding precedent, it certainly affords—provides some guidance to us, doesn't it, in this case? What the court said—because of the government's limited argument, there are a number of caveats in CNA. Repeatedly, the court said—and I'd just like to read one of them. It says, regarding future cases, to the extent that the government can demonstrate affirmative errors through reference to additional evidence and flaws in the arguments in future cases in which plaintiffs make the same arguments, this opinion should not be understood to bar future courts from also considering that evidence in those arguments. And that's just one of the caveats, and that can be found at, I believe, footnote 31. There's caveats like that throughout the opinion. Let me—one of the phrases, whether as holding, victim, or just general observations, what of anything that the court in Siena-Garden say about the nature of this statute? Did it say it was or was not a statute for a general application? It didn't address the Sovereign Act's defense, so it did not make that specific conclusion. But what you can read in it is, because it's being applied to plaintiffs who are not in contractual privity, it basically says it is a contract, it is a statute, that affects people whether or not they are in privity of contract with the government. Thus, under the Yankee Atomic decision, which said, let's look at who's affected by the statute. Let's see, are they the same people that are in privity of contract with the government? Counsel, just one second. Footnote 31 you read to me, it just occurred to me, that's entirely in the discussion of the Penn Central factors that the government limited itself and said that in the context of these Penn Central factors, we're not meaning to say that they were open. It wasn't in the context of the discussion of the Sovereign Act's defense at all, was it, that footnote? Your Honor, the thrust of Scandina 8 was, it was not a contract, so it was not a Sovereign Act's defense discussion. The whole, what the plaintiffs cite Scandina 8 for is that, I mean, and ultimately what the court held was that there was a taking based on the Penn Central factors. So in saying that, it is saying basically everything of import and value in the decision is subject to the government raising new arguments. Mr. Gensler, can I just look at a phrase or two from Scandina 8? Yes, Your Honor. As you point out, the question is often targeting, whether this person targeted...  And here's what Scandina 8 says, the enactment of the two statutes... If I could just have the page so I can follow along. I'm at 13, 34, and 35. Thank you, Your Honor. The enactment of the two statutes directly and intentionally abrogated the contracts. The effect on the contracts is therefore not merely consequential, where Congress's action has the effect of keeping the contract, blah, blah, blah, goes on, but that directly and intentionally targeting language, isn't that exactly what you're saying we should not find here? Your Honor, if the government had been found to be in contractual privy with Scandina, then absolutely. But the fact that we weren't, what this demonstrates is this. The Supreme Court in Winstar, in a plurality, and what Yankee Atomic says is, we want to know, is the government trying to abrogate its own contracts? Not any contracts, its own contracts. If it's affecting people outside of its own contracting partners, substantially or significantly, then we know that it's not going after its own contracts. And that's the point. Scandina 8 stands for the point, if anything, that the government wasn't going after its own contracts, because it wasn't in privy with these people. Now maybe you could say, okay, well, we can talk about whether there was a taking, but this doesn't, this undermines the point that sovereign act isn't available for contract defense. And under Yankee Atomic, what we have was a very clear examination of whether it was focused on the contracting partners or not. And that is something that Senator Gardner can't address because he didn't consider that, because there was no privy. In, in, um, this court has seen four different plaintiffs regarding the 221 and 236 programs. The Greenbrier case, Senator Gardner's, Chancellor Anaheim Gardner's. Over 350 plaintiffs. In those cases, this is the only one where they assert privy of contract. That means, based on just the cases this court has seen, we know almost extensively, almost That means, under the Sovereign Acts Doctrine, we, Congress, was not targeting its contracting partners. That's the question that the, that the Supreme Court asks. In, in, in Winstar, um, this is what they call, this is what the plurality says. We're a substantial partner. Yes, sir. Attempting in that statute to reach its own contracts to make the Sovereign Act inappropriate. But it, it, it. And when the, the passage from Siena-Haitian, Judge Raderow, seems to suggest that the court was saying it's sufficiently specific in this situation that the Sovereign Act Doctrine doesn't apply. Isn't, isn't that pretty much what. No, no, your Honor. Because what the, the, the court was saying. Correctly, intentionally abrogated the contracts? The contracts of people, even if that's true, which we obviously, we, we, we, we disagree. But even if that's true, of the, to finish the sentence, your Honor, contracts of people it was not in privity with. That, the only reason the government's in privity with the plaintiffs is because their, their, their loan was defaulted on, the insurance was paid, and it came back to the government. That was a, a, a consequence. It was, it was an intentional contracting partner. And so, the, the, the language that you read as, however harsh it is, it's, it doesn't go to the Sovereign Act Doctrine. This is what the Supreme Court said. Where substantial part of the impact of the government's action, rendering performance impossible, falls on its own contractual obligations, the defense will be unavailable. That's not the case here. What are you quoting from? I'm quoting. What cases? That's, that's the Winstar case at 898. That's not the case here. This is the reverse, where it's, substantially falls on people, we, that we can talk about it, take it, but it's, it's not falling on the, the, substantially on the people who were in contractual privity. In fact, that's the whole question. The, the same, the, the court also said this. The generality requirement, that's because it's a, they're looking for public and general contract, statute. The generality requirement will almost always be met where, as in Deming, the contractual action bears upon the government's contract as it bears upon all similar contracts between citizens. That's this case. It bears on the plaintiff's contract as it bears on all these other plaintiffs who, however you may think that they were wrong, we could talk about that under takings, were not wrong as contracting partners of the government. So, if the trial court did this analysis, it looked both at the nature of the, the, the statute itself and at who was affected. And basically... Doesn't your position basically involve a rather tricky dilemma, which is to whatever extent you prevail in your claim that this is a statute of broad general application that also suggests that the policies of the taking clause would be served by making the population as a whole pay for it? Well, Your Honor, that would take us to our takings, to the takings analysis. And what the trial court found was that the plaintiff simply didn't establish the necessary elements of economic impact. And this court has repeatedly said economic impact under the three prongs is the most important. What the trial court did... The question on that is how, how much? You don't question there's some economic impact as a result of the application of the statute? Absolutely. Our own expert found around 8% and I think the court adjusted that up to 10%. And the question is how much of an economic impact must there be in a temporary takings  We have never seen a case, Your Honor, I've never found one in my work on these cases where economic impact below 50% was sufficient to find a taking under the Penn Central factors. What this court has said in Meritrans was that you need serious financial loss. This court has rejected in the past takings claims of even 75% to 92% not enough economic impact. You can see Apollo Fuels for that. What you seem to be saying is that even in a temporary taking case, there has to be a very substantial economic loss. Is that right? Your Honor, in the first English case, the Supreme Court said we don't look at differently temporary and permanent takings. If the court was to establish a different... But you don't look at them differently to determine whether there's been a taking or what? Well, in that... I mean, they're not the same, obviously. But, Your Honor, if we were to establish a different test for economic impact for a temporary taking and for a permanent one, what you would do is this. You'd be saying, look, we're going to make it easier if it's a temporary taking than a permanent. And if you did that, first of all, you created an incentive for the government not to end the taking even though it doesn't need it anymore. Because by ending it, it's getting itself up to an easier standard. While continuing it, it gets to the more serious standard that's been established for many years. But also, you basically say to the people who are subject to permanent takings, look, if it had only been temporary, you got an easier standard. There's no reason in the law that the government should be subject to... When something is temporary, to be more likely to find a taking. Well, Your Honor, you said there's no reason the government should suffer. You can look at it from the other point of view. There's no reason why the individual whose property is... The value of his property is diminished or so. Well, Your Honor, I believe that they should be paid if they can establish the case. What I'm saying, Your Honor, is that you shouldn't have a different standard for temporary or permanent. Because by setting up that duality, what you're saying is that for some reason, being affected for four years is somehow worse and subject to a lower standard than being affected forever. And just logically, economically, that doesn't... Well, no. The fundamental difference seems to be between the owner having all of his property interest taken away or merely having the value of the property interest diminished during a certain period when the temporary taking is in effect. But again, I don't think this would be necessarily... It would be one thing, it seems to me, if I say, affected today, I'm taking your automobile and you can't use it anymore. It would be another thing, it seems to me, if I said, affected today, I'm taking your automobile for a year and you can't use it for a year. But after a year, you can go use it as you have been. It seems to me those are not quite the same thing. The impact on you is quite different. Well, but Your Honor, they are the same thing in the sense that the government... But first of all, Your Honor, what you're describing is a physical taking and what we have here is an alleged regulatory. So what we're talking about is the government saying, we're going to regulate you permanently versus we're going to regulate you for a year. The whole idea is we need a consistent test to say, look, is that regulation, does it amount to a taking? And so by kind of putting your finger on the scale for the temporary taking, you say, well, the temporary taking, it does. But logically, there's no reason. If the regulation only lasts for a year, then it's lifted. Why? Was that worse than if the regulations had continued on indefinitely? There's no real reason to think of it. Your time's up, Your Honor. So I want to ask you one quick question, which is, what should we do with damages in this case if I disagree with you on the breach of contract? So what should we do? Should we remand this and let the district court or lower court, I should say, redo this whole damages calculation? No, Your Honor. The plaintiffs, as part of their taking claim, alleged lost profits as one measure of economic impact. That was what they described. They presented it to the court. They had an expert. The court reviewed it, addressed it, and found, I believe, $640,000 under that element. That would be the measure of damage under a breach of contract claim. They would not be entitled, obviously, to interest. They have not properly or substantially challenged that number. They've made some challenges to it, but I don't believe that they stand. So if the court should find against us on these other items, then that presumably would be the measure of damage. Thank you, Mr. Dinshaw. But, Your Honor, may I add just one thing? We do have other breach of contract defenses that have not been raised, and I want to make sure that we say this. So for that, we would ask for a remand. We did not get a chance to raise certain defenses that arose after the Supreme Court's decision in Franconia. I don't know if the Court's familiar with Franconia, but basically, it established a framework for thinking about when the statute of limitations runs. That case came out after the trial court's decision here. And based on that case, we have a defense of no breach of contract that we would ask for a remand on that. So the short answer, I guess, Your Honor, is we wouldn't ask for a remand on damages, but on that issue. Mr. Kramer? We have almost five minutes. Do we need to remand in light of Franconia as the government has suggested for them to enter new defenses for breach of contract? I think you would be immutable to that, Your Honor. Answering some of Mr. Dinshaw's arguments, very briefly, it seems to me he tries to slice the Sienega case up too much into discrete parts and not take the whole thing. We have relied on both the methodologies and the Court's statement as to the way to arrive, properly arrive at the amount of compensation. I think the distinction that the defendant tries to raise with respect to the thrust and meaning of the statute is wholly improper. It's obvious that Congress intended to cover both groups. It didn't say how many there were in each group. We have shown, for example, that the regulatory agreement covers both situations. The regulatory agreement also covers not only the time when the mortgage is insured, it Now, how many foreclosures there are, or how many cases there are before this Court, I do not know the exact number. I hear now, a recent case said there are almost 800 projects. That may very well be. But I think that, regardless, I think the problem with my case is we are a single project and the other problem is I had a group of investors that were most tenacious. As you can see from the facts, one, almost from the very beginning, the project ran into financial trouble. The rents didn't cover all the expenses and the mortgage. We got, initially, when the mortgage was transferred to Ginnie Mae, right away, on the day the mortgage began, we started to run into problems and we had work out agreements with Ginnie Mae. Until, from 71 to 77, until in 77, the mortgage fell into default. Ginnie Mae turned the mortgage over to HUD, presumably for foreclosure. At the same time, the partners decided to remove the management, bring in a new manager, make a new investment, they invested over $200,000 more in 1977, $300,000. And then go on, and HUD decided, yes, we'll halt the mortgage, we'll get the mortgage in, and continue on. My clients continued. And again, they ran into problems, even with new management. So, in 1985, it fell into default again. And again, the partners said, rather than let it go, they put in more money, brought the mortgage current, and just about the time of the payoff, when their 20 years was up, here comes the Congress. And it seems to me that the Congress had intended all of this program to be frozen. None of the projects were to be let go, unless they could meet the specific criteria in the statute. And I want to argue those, because I think they've been conceded. Thank you.